[929 NYS2d 139]

T.V. et al., Appellants, v New York State Department of Health, Respondent.

Second Department, August 9, 2011

APPEARANCES OF COUNSEL

*Melissa B. Brisman*, New York City, for appellants T.V. and D.Y.-V., and *Rumbold & Seidelman, LLP*, Bronxville (*Denise E. Seidelman* and *Nina E. Rumbold* of counsel), for appellants N.N. and R.N. (one brief filed).

*Eric T. Schneiderman, Attorney General*, New York City (*Alison Nathan* and *Sudarsana Srinivasan* of counsel), for respondent.

## OPINION OF THE COURT

AUSTIN, J.

On this appeal, we are asked to determine whether a complaint which seeks a judgment (a) declaring that a genetic mother is the legal mother of a child born to a gestational carrier under a surrogate parenting contract is entitled to be named as the child's legal mother on the child's birth certificate, without requiring a formal adoption proceeding, and (b) declaring Family Court Act §§ 517 and 542 and Domestic Relations Law article 8 to be unconstitutional, states cognizable causes of action. For the reasons set forth below, we hold that the plaintiffs stated viable causes of action for the relief sought.

## I. Background

### A. Factual Background

The underlying facts are not in dispute. In 1999, the plaintiff D.Y.-V. (hereinafter the Genetic Mother) underwent a hysterectomy after it was discovered that her uterus was surrounded by a malignant tumor which rendered her unable to conceive, carry, and give birth to a child. Her ovaries were left intact.

After her subsequent marriage to the plaintiff T.V. (hereinafter the Genetic Father and together the Genetic Parents), the Genetic Mother desired to have a biological child with the Genetic Father. In order to do so, the plaintiff N.N. (hereinafter the Gestational Mother), a close friend of the Genetic Parents,

offered to act as a gestational surrogate of the eggs of the Genetic Mother which had been fertilized with the sperm of the Genetic Father through in vitro fertilization. No fee was sought by or provided to the Gestational Mother as she undertook to carry the Genetic Parents' child "out of friendship, compassion, and her desire to assist the [Genetic Parents] in becoming parents of their own biological child."

One of the eggs which had been retrieved from the Genetic Mother's ovaries and fertilized with the sperm of the Genetic Father was transferred into the uterus of the Gestational Mother. The Gestational Mother was confirmed pregnant and ultimately delivered a child on May 1, 2009, at Winthrop University Hospital (hereinafter the hospital)[1] in Nassau County.

Following the birth of the child, the Gestational Mother and her husband, the plaintiff R.N. (hereinafter the Gestational Father and together the Gestational Parents), executed documents relinquishing any and all parental rights to the child to which they may have been entitled.

Within the statutorily prescribed period of five days, the hospital submitted the birth registration documentation to the defendant, New York State Department of Health (hereinafter the DOH), which identified the Gestational Mother as the mother of the child but did not identify a father.

B. Procedural Background

Prior to the birth of the child, the Genetic and Gestational Parents jointly commenced this action seeking a judgment (1) declaring the Genetic Parents to be "the legal mother and legal father" of the child being carried by the Gestational Mother, (2) enjoining the hospital from issuing a birth certificate identifying the Gestational Parents as the child's parents, and (3) enjoining the DOH from listing the Gestational Parents as the child's parents on the birth certificate.

The plaintiffs moved, by order to show cause, pursuant to CPLR 6301 and 6311, for preliminary injunctive relief. On May 4, 2009, the Supreme Court denied the plaintiffs' motion for preliminary injunctive relief enjoining the DOH from issuing a birth certificate naming the Gestational Parents as the legal parents.

---

**1.** Winthrop University Hospital was initially named as a defendant, but the plaintiffs discontinued their action against it prior to the service and filing of their amended complaint.

On May 13, 2009, following a hearing before the Supreme Court on the issue of paternity during which all four plaintiffs testified, the Supreme Court granted an Order of Filiation, without objection from the DOH, recognizing the Genetic Father as the father of the child and directing that he be named the father on the child's birth certificate.

Subsequent to that hearing, the plaintiffs served and filed an amended complaint dated May 18, 2009, in which they sought a judgment declaring the Genetic Mother "to be the legal mother of the [c]hild" (first cause of action) and a judgment declaring Family Court Act §§ 517 and 542 and article 8 of the Domestic Relations Law to be unconstitutional and void and, upon such declaration, directing the DOH to amend the birth certificate naming the Genetic Mother as the child's birth mother (second cause of action). In their second cause of action, the plaintiffs alleged that Family Court Act §§ 517 and 542 violated the Genetic Mother's rights to equal protection under the New York and United States Constitutions, since the Genetic Father was able to obtain an order of filiation from the court while "deny-[ing] that same protection and enforcement of the same fundamental liberty interest to the similarly situated genetic and intended mother." Moreover, they alleged that article 8 of the Domestic Relations Law, which was enacted to prohibit commercial surrogacy and to preclude a gestational carrier from being contractually compelled to relinquish her parental rights, violated the Due Process Clauses of the United States and the New York State Constitutions if it was read to presume that the Gestational Mother was the legal mother of the child and to preclude the Genetic Mother from establishing her parental relationship to the child.

On September 25, 2009, the DOH moved to dismiss the amended complaint pursuant to, inter alia, CPLR 3211 (a) (7). It maintained that Public Health Law § 4130 was clear that the "woman who actually gives birth to the child is the mother" without any reference to genetics. Thus, it argued, relying on the definition of a live birth as contained in the Public Health Law, it was "always clear and indisputable who the mother is." The DOH asserted that neither the Family Court Act nor any other provision of the law provided for an order of maternity.

The DOH also contended that the relief sought by the plaintiffs was contingent upon the void and unenforceable surrogate parenting contract. It contended that such agreements, even when entered between friends with no compensation, were invalid pursuant to Domestic Relations Law § 122.

The DOH further maintained that the statutory scheme did not violate the Equal Protection or Due Process Clauses of the United States or the New York State Constitutions because the challenged classification served an important governmental objective of having an accurate identification of the birth parents on the child's birth certificate. Citing *Tuan Anh Nguyen v INS* (533 US 53, 73 [2001]), the DOH contended that the biological differences between men and women in relation to the birth process cannot be disputed and the principle of equal protection does not prohibit the United States Congress or the New York State Legislature from addressing this issue in a manner specific to each gender.

In opposition to the motion to dismiss, the plaintiffs contended that the statutory framework was adopted at a time when the identity of a newborn's mother was always clear and, thus, did not provide for a declaration of maternity, but that the courts have the inherent authority to make such a declaration. Otherwise, they contended that the statutes as applied violated the Due Process and Equal Protection Clauses of the New York and United States Constitutions since individuals have a fundamental right to privacy, which includes the right to bear and raise children. They maintained that this encompassed situations in which parents were compelled to use advances in medical technology in order to conceive and raise their own biological child and that there was no compelling state interest for interfering with this right. They contended that, with the advent of new technologies, which allow a genetic stranger to carry and give birth to a child not her own, the presumption that the woman who gave birth was the mother of the child was rendered rebuttable and, thus, men and women are similarly situated with respect to a gestational surrogacy arrangement.

In an order entered January 21, 2010, the Supreme Court, inter alia, granted that branch of the DOH's motion which was to dismiss the plaintiffs' amended complaint pursuant to CPLR 3211 (a) (7) for a failure to state a cause of action (2010 NY Slip Op 30147[U] [2010]). The Supreme Court determined that the plaintiffs' amended pleading was "fundamentally flawed" since "[i]n the event that the Legislature has failed to adequately contemplate surrogate births, 'the failure of Family Court Act article 5 to provide a vehicle for resolving the type of controversy involved here is to be redressed [by it]—which "created" and "wholly control[s]" paternity proceedings—and not the courts' " (*id.* [citations omitted], quoting *Matter of H.M. v E.T.*, 65 AD3d

119, 129 [2009], *revd* 14 NY3d 521 [2010]). The Supreme Court went on to state "[m]oreover, an alternative remedy exists in the form of an expedited adoption which, notably, was capable of being completed far more expeditiously than this action." The plaintiffs appeal.

## II. Discussion

### A. Historical Perspective

Through the years, the law has tried to keep pace with medical developments in the field of assisted reproduction. Despite this, the law has not yet caught up with science.

After years of debate, the Legislature concluded that surrogate parenting contracts were contrary to public policy and enacted legislation in July 1992 which became effective in July 1993, declaring surrogate parenting contracts void and unenforceable (*see* Domestic Relations Law §§ 122-124).

Prior to the Legislature's enactment of the aforementioned statutes, the issue of parental rights arising from surrogacy agreements received national attention with the case of *Matter of Baby M.* (109 NJ 396, 537 A2d 1227 [1988]), decided by the New Jersey Supreme Court in 1988 (*see generally McDonald v McDonald*, 196 AD2d 7, 10 [1994]; Scheinkman, Practice Commentaries, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law § 122, at 438-440). There, the husband and wife desired, but could not have, their own biological children (*see Matter of Baby M.*, 109 NJ 396, 537 A2d 1227 [1988]). Pursuant to an agreement, the husband's sperm was used to fertilize the eggs of a surrogate. The surrogate delivered the baby, but ultimately reneged on the contract, claimed that she was the mother of the baby, and sought parental rights. After voiding the surrogacy contract as against public policy, the Supreme Court of New Jersey held that the surrogate was the mother of the child and was entitled to visitation rights, even though custody was given to the father, based on a best interest of the child analysis.

Even before the *Baby M.* case was decided, New York State convened a "Task Force on Life and the Law" (hereinafter the Task Force), with a goal of developing recommendations for public policy on a range of issues arising from advancements in medical technology (*see* New York State Task Force on Life and the Law, *Surrogate Parenting: Analysis and Recommendations for Public Policy* [May 1988]). The Task Force recommended legislation that would declare surrogacy contracts void and ban

fees for surrogates and brokers for surrogates. The Task Force's conclusion reads, in part, as follows:

"Existing laws on adoption and artificial insemination permit surrogate parenting when the arrangement is not commercial and remains undisputed. The legislation proposed by the Task Force would not prohibit the arrangements under these circumstances. Nor would it override existing statutes permitting the payment of reasonable expenses to women arising from pregnancy when such expenses are paid in connection with an adoption and are subject to court approval.

"The proposed legislation would greatly reduce, but would not eliminate, surrogate parenting. In some cases, even voluntary, non-commercial surrogate arrangements may result in disputes about custody and care of the child. As part of its legislative proposal, the Task Force recommends that custody should remain with the birth mother and her husband, if any, unless the court finds, based on clear and convincing evidence, that the child's best interests would be served by awarding custody to the father and/or the genetic mother."

Legislation based on the Task Force's proposal was enacted in 1992 (*see* Domestic Relations Law §§ 122-124). Domestic Relations Law § 122 declares surrogate parenting contracts void and unenforceable as contrary to public policy. Domestic Relations Law § 123 provides for civil penalties that may be assessed against parties to a commercial surrogacy contract, as well as against persons who induce, arrange, or otherwise assist in the formation of such contracts. Domestic Relations Law § 124 (1) concerns proceedings regarding parental rights to children born of such a contract and establishes that "the court shall not consider the birth mother's participation in a surrogate parenting contract as adverse to her parental rights, status, or obligations."

In 1998, the Task Force issued an updated Executive Summary of the "Task Force on Life and Law," which, in addressing children that result from gestational surrogacy,[2] stated that "[t]he determination of maternal rights and responsibilities in

---

**2.** The situation at bar is considered to be a gestational surrogacy arrangement since the gestational mother's egg was not utilized.

gestational surrogacy arrangements should reflect both the genetic and gestational contributions to motherhood" (New York State Task Force on Life and Law, *Executive Summary of Assisted Reproductive Technologies: Analysis and Recommendations for Public Policy*, available at http://www.health.ny.gov/regulations/task_force/reports_publications/execsum.htm [Executive Summary of the Task Force on Life and Law]). Significantly, the report recommended that "[i]f both the genetic mother and the birth mother agree, after the child is born, that the genetic mother should be recognized as the child's sole legal mother, the law should provide a mechanism for achieving that result efficiently, without the need for a formal adoption proceeding" (*id.*). Such is the case here.

B. Prior Court Decisions

The issue of declaring the maternity of a child born from an embryo created from an egg of a genetic or biological mother and then carried by a surrogate or gestational mother is one of first impression at the appellate level. However, this issue concerning gestational surrogacy and the request for a declaration of maternity has arisen in two reported Supreme Court cases and one reported Family Court case (*see Doe v New York City Bd. of Health*, 5 Misc 3d 424 [2004]; *Arredondo v Nodelman*, 163 Misc 2d 757 [1994]; *Matter of Andres A. v Judith N.*, 156 Misc 2d 65 [1992]).

In *Matter of Andres A. v Judith N.* (156 Misc 2d at 66-67), a genetic mother's eggs were fertilized with her husband's sperm and then implanted into the uterus of the gestational or surrogate mother, resulting in the birth of twins. The hospital released the twins to the genetic parents (*id.* at 67). The genetic parents and the gestational parents had entered into a gestational surrogate agreement (*id.*).

The genetic parents filed a petition, pursuant to article 5 of the Family Court Act, naming the gestational parents as respondents in the Family Court, seeking a declaration of maternity and paternity (*id.* at 66). After considering the affidavits of all four parties and their testimony, the results of DNA and blood-testing of the children, the genetic parents, and the gestational mother, which essentially confirmed that the genetic parents were the biological parents of the children and excluded the gestational mother as the biological mother of the children, and noting that the gestational parents as respondents did not contest the relief sought by the genetic parents, the Family Court directed the entry of an order of filiation declaring

the genetic father to be the father of the twins (*id.* at 69). However, the Family Court dismissed the genetic mother's petition, explaining that Family Court Act article 5, entitled "Paternity Proceedings," was the only article that provided for a declaration of parenthood (*id.* at 69). It stated that the statute made no provision for maternity and, thus, the genetic mother's claim should be addressed by the Legislature (*id.* at 70). The Family Court then noted that the genetic mother was not without a remedy since she could adopt her biological children (*id.* at 71).

Thereafter, the genetic mother filed a petition in the Supreme Court, under the caption of *Arredondo v Nodelman,* for a declaration that she was the mother of the children and for an order directing the City of New York to amend the children's birth certificates to include her name as the mother in place of the name of the gestational mother (*see Arredondo v Nodelman,* 163 Misc 2d at 758). The City did not oppose the petition insofar as it sought to change the name of the mother on the children's birth records (*id.*).

Based upon the undisputed evidence that the children were born from the eggs of the genetic mother fertilized with the sperm of the genetic father and not from the eggs or sperm of the gestational parents, and the results of the genetic testing, the Supreme Court concluded that the genetic mother was the legal mother of the children (*id.* at 759). As a result, it granted the petition, declared the genetic mother the "mother of the petitioner children," and directed the City to "issue new birth records for the children reflecting that fact" (*id.*).

Similarly, in *Doe v New York City Bd. of Health* (5 Misc 3d at 425), the genetic parents of triplets, born to a gestational mother, the genetic mother's sister, for no monetary consideration, joined with the gestational parents in seeking a judgment that the genetic parents were the legal parents of the children and that the genetic parents' names should appear on the children's birth certificates issued by the New York City Department of Health and Mental Hygiene. That agency opposed the genetic and gestational parents' motion filed prior to the birth of the children for an order for preliminary injunctive relief on the ground that the order violated article 8 of the Domestic Relations Law and that medical records concerning births need to remain accurate to prevent fraud or mistake in matters of identity, citizenship, inheritance, and insurance coverage (*id.* at 426). The Supreme Court denied the plaintiffs' request for pre-

liminary injunctive relief except to the extent of enjoining the hospital from issuing a report until the fifth business day after the children's birth (*id.* at 425).

Subsequent to the birth of the children and the genetic father obtaining an order of filiation from the Family Court, the plaintiffs moved for a declaration that the genetic mother was the mother of the children. In support of their motion, the plaintiffs submitted the gestational mother's sworn "Relinquishment of Parental Rights." In opposition, the New York City Department of Health and Mental Hygiene took the position that it would not oppose the postbirth amendment of the birth certificates provided that the genetic parents established through DNA evidence that they were the genetic mother and father of the children or if the genetic parents were named the legal parents of the children through a formal adoption proceeding (*id.*).

The Supreme Court determined that, due to its constitutional grant of unlimited original jurisdiction, it had the authority to determine the identity of the children's legal mother (*id.* at 427). The Supreme Court explained:

> "Plaintiffs correctly noted that the Family Court could not afford any relief to Mrs. Doe, the biological mother. The Family Court Act was written in 1962, before today's medical advancements which allow for two women to claim maternal rights to a baby, and is silent as to maternity. It follows, then, that the Supreme Court, as a court of 'general original jurisdiction in law and equity,' has the power to issue an 'order of maternity.' Section 7 (b) of article VI of the New York Constitution provides that '[i]f the legislature shall create new classes of actions and proceedings, the supreme court shall have jurisdiction over such classes of actions or proceedings.' Similarly, the Supreme Court has jurisdiction over a novel dispute where no statutory provision takes it away. Section 124 of the Domestic Relations Law specifically leaves open the type of legal proceeding that may be instituted following the birth of a child born pursuant to a surrogate parenting contract, and does not limit the parties to a formal adoption proceeding" (*id.* at 427 [citations omitted]; *see generally Kagen v Kagen*, 21 NY2d 532 [1968]).

The factual similarities between *Arredondo* and *Doe*, on the one hand, and the present matter, on the other, warrant the

same conclusion. In all three cases, the interested parental parties agreed that the genetic parents would and should be the legal parents of the offspring and that the genetic parents' names should appear on each child's birth certificate (*see Doe v New York City Bd. of Health*, 5 Misc 3d at 429; *Arredondo v Nodelman*, 163 Misc 2d at 758 [no papers were received from the gestational mother objecting to the petitioner's request for a declaration that the genetic mother was the legal mother of the children and an order directing the City of New York to amend the birth certificates of the children to reflect this determination]). As a result, these cases do not involve a dispute over a surrogate parenting contract, since the genetic and gestational parents are in agreement with respect to the identity of the legal parents of the subject children. The protection of the Gestational Mother, in this case, as contemplated under Domestic Relations Law § 122, is not implicated, since she joined in the application of the Genetic Parents.

The Supreme Court in *Doe* addressed the fact that there is no applicable provision prohibiting the Supreme Court from issuing an order of maternity: "Section 124 of the Domestic Relations Law specifically leaves open the type of legal proceeding that may be instituted following the birth of a child born pursuant to a surrogate parenting contract, and does not limit the parties to a formal adoption proceeding" (*Doe v New York City Bd. of Health*, 5 Misc 3d at 427).

Significantly, although there is no statutory provision providing for a declaration of maternity, there is also no provision prohibiting such declaration. Furthermore, the Domestic Relations Law does not limit the parties to a formal adoption proceeding as suggested by the Supreme Court here. Instead, the Domestic Relations Law simply provides that the gestational carrier's participation in a surrogate parenting contract should not be held against her (*see* Domestic Relations Law § 124 [1]; *Doe v New York City Bd. of Health*, 5 Misc 3d at 427).

■ Additionally, the fact that article 5 of the Family Court Act addresses only ''Paternity Proceedings'' rather than maternity proceedings, neither deprives the Family Court nor the Supreme Court of jurisdiction to issue an order of maternity (*see* Family Ct Act art 5 [''Paternity Proceedings'']). Such an approach is consistent with General Construction Law § 22, which mandates that the construction of statutes which contain ''gender indicative words'' should be deemed to refer to ''both male or female persons.''

While the DOH correctly notes that both *Doe* and *Arredondo* involved determinations made by the New York City Department of Health and Mental Hygiene which, as a New York City agency, is exempt from Public Health Law article 41, this distinction is irrelevant. In both cases, the Supreme Court recognized its inherent authority to render a declaratory judgment that a genetic mother is the legal mother of a child born to a gestational carrier (*see Doe v New York City Bd. of Health*, 5 Misc 3d at 427; *Arredondo v Nodelman*, 163 Misc 2d at 758-759).

Moreover, the process adopted by the City of New York concerning the issuance of initial birth certificates and the amendment of such birth certificates is very similar to the process adopted by the State of New York. Both section 201.03 of the New York City Health Code (24 RCNY) and Public Health Law § 4130 require the registration of a child's birth certificate within five days after the birth (*see* Public Health Law § 4130 [2] ["The birth of each child born alive in this state shall be registered within five days after the date of birth by filing with the registrar of the district in which the birth occurred a certificate of such birth, which certificate shall be upon the form prescribed therefor by the commissioner"]; New York City Health Code [24 RCNY] § 201.03 ["Reports shall be filed within 5 business days after the birth with the office maintained and designated by the Department for such purposes"]).

In addition, New York City also has a regulation comparable to that of New York State regarding the amendment of birth certificates. The statutory language in section 17-167 of the Administrative Code of the City of New York that a "new birth record shall be made whenever . . . [n]otification is received by the department from the clerk of a court of competent jurisdiction or proof is submitted of a judgment, order or decree relating to the parentage of the person" (Administrative Code of City of NY § 17-167 [a] [2]) is similar to the statutory language in Public Health Law § 4138 that "[a] new certificate of birth shall be made whenever: . . . notification is received by, or proper proof is submitted to, the commissioner from or by the clerk of a court of competent jurisdiction or the parents, or their attorneys, or the person himself, of a judgment, order or decree relating to the parentage" (Public Health Law § 4138 [1] [b]). Accordingly, given the similarities between New York City and New York State regulations concerning the registration and amendment of birth certificates, the defendant's argument that

*Doe* and *Arredondo* are distinguishable from the present dispute because *Doe* and *Arredondo* did not concern the application of Public Health Law article 41 is without merit.

The Supreme Court has the authority to determine a child's legal parentage under article 4 of the Family Court Act (*see Green v Montgomery*, 95 NY2d 693, 699 [2001] ["Under the New York Constitution, Supreme Court has concurrent jurisdiction with the Family Court"]; *Matter of H.M. v E.T.*, 14 NY3d at 527). In *Matter of H.M. v E.T.*, upon which the Supreme Court here relied in granting that branch of the DOH's motion which was to dismiss the amended complaint pursuant to CPLR 3211 (a) (7), the Court of Appeals held that the Family Court has the inherent authority under article 4 of the Family Court Act to determine whether a female is, in fact, a child's legal parent (14 NY3d at 527). *Matter of H.M. v E.T.* involved an action by a biological parent seeking child support from her former same-sex partner (*id.* at 524). After becoming pregnant by artificial insemination following many failed attempts, H.M. and her partner, E.T., shared the expenses associated with the conception, the birth, and the care of the child (*id.* at 525). However, four months after the child was born, E.T. terminated the relationship with H.M., resulting in H.M. moving to Canada to live with her parents (*id.*).

H.M., a Canadian citizen, subsequently filed an application in Ontario, Canada, seeking a declaration of parentage and an order of child support establishing monthly payments retroactive to the child's birth. Her petition was transferred to Family Court, Rockland County, pursuant to the Uniform Interstate Family Support Act, Family Court Act article 5-B.

E.T. moved to dismiss the petition on jurisdictional grounds before a Family Court Support Magistrate. The Magistrate granted E.T.'s motion and dismissed the petition, finding that the Family Court did not have subject matter jurisdiction over the petition. Upon H.M.'s written objections to the dismissal, the Family Court reversed the order and directed a hearing to determine whether E.T. should be equitably estopped from denying parentage and support obligations (*id.*).

E.T. appealed. This Court, with two Justices dissenting, reversed and reinstated the order dismissing the petition for lack of subject matter jurisdiction on the basis that Family Court Act article 5, enacted to protect the welfare of children born out-of-wedlock, "only provide[d] a vehicle for resolving controversies concerning a male's fatherhood of a child" (*Matter of H.M. v*

*E.T.*, 65 AD3d 119, 124 [2009]). However, this Court specifically noted that:

> "[O]ur holding that the Family Court lacks subject matter jurisdiction to entertain applications in the nature of H.M.'s application does not leave H.M. bereft of a forum for the adjudication of her application. This is because, under the circumstances, New York Constitution, article VI, § 19 (e) authorizes the Family Court to 'transfer to' the Supreme Court—a court competent to entertain H.M.'s application (*see* NY Const, art VI, §§ 7, 13 [d])—'any . . . proceeding . . . over which' the Family Court 'has no jurisdiction' " (65 AD3d at 128).

The Court of Appeals, in reversing the decision and order of this Court, found that the Family Court had "subject matter jurisdiction to adjudicate a support petition brought pursuant to [Family Court Act article 5-B] by a biological parent seeking child support from her former same-sex partner" without deciding whether it was also within the Family Court's article 5 jurisdiction (14 NY3d at 524). In discussing the powers granted to the Family Court by the New York Constitution and statute, the Court of Appeals explained that the Family Court had jurisdiction to ascertain whether E.T. was the child's parent to determine if she had a support obligation pursuant to article 4 of the Family Court Act since:

> "Family Court indisputably has jurisdiction to determine whether an individual parent—regardless of gender—is responsible for the support of a child. Moreover, statutory jurisdiction—as Family Court has—carries with it such ancillary jurisdiction as is necessary to fulfill the court's core function. Thus, because Family Court unquestionably has the subject matter jurisdiction to ascertain the support obligations of a female parent, Family Court also has the inherent authority to ascertain in certain cases whether a female respondent is, in fact, a child's parent" (*id.* at 527 [citations omitted]).

Although *Matter of H.M. v E.T.* did not involve a surrogate parenting arrangement, since the Court of Appeals determined that the Family Court, a court of limited jurisdiction, had the authority to determine whether a female is a child's parent, the Supreme Court, here, most certainly had the authority to

determine whether the Genetic Mother is indeed the child's legal mother. As such, even though the subject amended complaint was not brought pursuant to the jurisdiction of Family Court article 4, the ratio decidendi of the Court of Appeals' *Matter of H.M. v E.T.* decision that the Family Court has the jurisdiction to issue an order of maternity, the Supreme Court has concurrent jurisdiction to issue such an order here (*id.*; *see Kagen v Kagen*, 21 NY2d at 537-538).

The Supreme Court's authority to issue an order of maternity is also supported by this Court's determination in *McDonald v McDonald* (196 AD2d 7 [1994]). There, in an action for a divorce and ancillary relief, the wife twice underwent in vitro fertilization in which the sperm of her husband was mixed with the eggs of a female donor, and the fertilized eggs were then implanted in the wife's uterus (*id.* at 8-9). The wife was therefore the gestational, but not the genetic, mother of the two children born during the marriage (*id.*). The question before this Court was whether the wife was the parent—the "natural mother"—of the children for purposes of resolving the issue of custody (*id.* at 9). That question was answered in the affirmative (*id.*).

The case of *Johnson v Calvert* (5 Cal 4th 84, 851 P2d 776 [1993], *cert denied* 510 US 874 [1993]) is also instructive in this regard. The California Supreme Court was presented with a situation in which a surrogate gestational mother, who carried a child to term on behalf of two genetic parents, sought to retain custody of the child following the birth. The *Johnson* Court recognized that both the gestational mother and the genetic mother could arguably be considered the child's natural mother and, employing an "intent" test, determined, under the circumstances, that the genetic mother was the natural mother. Applying the intent test in *McDonald*, this Court found the *Johnson* Court's reasoning to be "persuasive" (196 AD2d at 12). Under the circumstances presented in *McDonald*, this Court determined that the wife, the gestational mother, was "the natural mother of the children" and "entitled to temporary custody of the children with visitation to the husband" (*id.* at 12).

While the circumstances were different, the Supreme Court in *McDonald*, with this Court affirming, made a declaration as to who was the "natural mother" of the children (*id.* at 12). Thus, the Supreme Court here erred in finding that it could not make a declaration as to whether the Genetic Mother is the legal mother of the subject child, and in dismissing the complaint for failure to state a cause of action.

C. That Branch of the Defendant's Motion Which was to Dismiss the Amended Complaint Pursuant to CPLR 3211 (a) (7)

1. Standard of Review

In considering a motion to dismiss for failure to state a cause of action pursuant to CPLR 3211 (a) (7), a court should "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (*Leon v Martinez*, 84 NY2d 83, 87-88 [1994]; *see Sarva v Self Help Community Servs., Inc.*, 73 AD3d 1155, 1155-1156 [2010]). Such a motion should be granted only where, even viewing the allegations as true, the plaintiff still cannot establish a cause of action (*see Parsippany Constr. Co., Inc. v Clark Patterson Assoc., P.C.*, 41 AD3d 805, 806 [2007]). In an action seeking a declaratory judgment, to withstand a motion to dismiss the complaint pursuant to CPLR 3211 (a) (7), the allegations of the complaint have to demonstrate the existence of a bona fide justiciable controversy (*see Halloran v Halloran*, 161 AD2d 562, 565 [1990]; *Sysco Corp. v Town of Hempstead*, 133 AD2d 751, 752 [1987]).

2. The Plaintiffs' First Cause of Action

New York courts have entertained petitions for maternity without requiring parents to go through an adoption proceeding in cases of gestational surrogacy (*see Doe v New York City Bd. of Health*, 5 Misc 3d 424 [2004]; *Arredondo v Nodelman*, 163 Misc 2d 757 [1994]; *see also Matter of Doe*, 7 Misc 3d 352 [2005]).

Although Public Health Law § 4130 provides that a birth certificate shall be filed within five days of the child's birth, Public Health Law § 4138 permits amendment of the birth certificate upon proof of, among other things, "a judgment, order or decree relating to the parentage" (Public Health Law § 4130 [2]; § 4138 [1] [b]).

Public Health Law § 4138 outlines the circumstances under which a new birth certificate shall be issued. Section 4138 (1) (b) and (c), respectively, refer to court orders or judgments related to parentage and court orders or judgments related to adoption. These sections provide as follows:

"1. A new certificate of birth shall be made whenever: . . .

"(b) notification is received by, or proper proof is submitted to, the commissioner from or by the clerk of a court of competent jurisdiction or the parents,

or their attorneys, or the person himself, of a judgment, order or decree relating to the parentage; or,

"(c) notification is received by, or proper proof is submitted to, the commissioner from or by the clerk as aforesaid of a judgment, order or decree relating to the adoption of such person. Such judgment, order or decree shall also be sufficient authority to make a new birth certificate with conforming change in the name of such person on the birth certificate of any of such person's children under the age of eighteen years whose record of birth is on file in the state health department" (Public Health Law § 4138 [1] [b], [c]).

Based on the plain reading of this statute, an order relating to adoption is not necessary for the issuance of a new birth certificate (see Public Health Law § 4138 [1] [b]). Accordingly, the Supreme Court erred in dismissing the complaint, finding that no cause of action was stated. Once a court of competent jurisdiction issues an order or judgment "relating to the parentage," the DOH commissioner, upon notification, "shall" issue a new certificate of birth (Public Health Law § 4138 [1] [b]).

Although adoption, the legal process by which a parent/child relationship is created where none previously existed (see Domestic Relations Law § 110), remains an "alternate remedy," to argue that the Genetic Mother was adequately protected based on this alternative underestimates the hardships of adoption. As aptly noted in Matter of Sebastian:

"Adoptions are complicated and filled with technicalities such that it is critical, if not imperative, to employ a lawyer at considerable cost. Filiation proceedings are considerably easier, and are often pro se, while statutory acknowledgment of paternity does not require, or even contemplate, a lawyer's assistance. Adoption proceedings are generally lengthy, taking many months, while both paternity procedures are quick and easy. Adoption requires an intrusive (and often expensive) professional 'home study' involving intimate details of a couple's relationship, finances, family and living situation, as well as fingerprinting and a mandatory check for a criminal record and any prior reported child abuse or neglect. There are no such requirements for a finding of paternity" (Matter of Sebastian, 25 Misc

3d 567, 580 n 40 [2009]; *see generally* Executive Summary of the Task Force on Life and Law).

Furthermore, the Supreme Court's suggestion that adoption was a suitable course in this situation does not take into consideration that there is already a preexisting relationship, a biological link, between the Genetic Mother and her child which cannot be ignored.

The relief requested by the plaintiffs does not interfere with the reporting requirements under article 41 of the Public Health Law. The plaintiffs aver that they "are not requesting that the gestational carrier *never* appear on the child's birth certificate, only that a hearing be held shortly after birth as part of a declaratory judgment action to adjudicate the child's legal parentage."

Since a declaratory judgment action would satisfy Public Health Law § 4138 and, under the circumstances, is the most appropriate mechanism to adjudicate legal parentage, the Supreme Court failed to appreciate its power to issue a declaration under CPLR 3001 when it concluded that the issue should be addressed by the Legislature. Moreover, the case, *Matter of H.M. v E.T.* (65 AD3d at 129), upon which the Supreme Court relied in concluding that "the failure of Family Court Act article 5 to provide a vehicle for resolving the type of controversy involved here is to be redressed [by the Legislature]," was reversed on appeal (*see Matter of H.M. v E.T.*, 14 NY3d 521 [2010]). Although the reversal was based on a review of article 4 of the Family Court Act and did not address article 5, the Court of Appeals nevertheless held that the Family Court has the subject matter jurisdiction to determine "whether a female respondent is, in fact, a child's parent" (*id.* at 527). Likewise, the Supreme Court has original, unlimited, and unqualified jurisdiction to consider and determine this question as well (*see Kagen v Kagen*, 21 NY2d at 537).

Accordingly, given that Domestic Relations Law § 122 was passed based on the recommendations of the Task Force, the Supreme Court erred in finding that it did not have the authority to issue an order of maternity to the Genetic Mother without resorting to the artifice of a formal adoption proceeding and that the first cause of action of the amended complaint failed to state a cause of action. Moreover, given that there is no potential conflict over the custody and care of the child, the validity of the underlying contract is immaterial to this case, as the Supreme Court was not being asked

to enforce such a contract (*see Doe v New York City Bd. of Health*, 5 Misc 3d at 426-427; *Matter of Andres A. v Judith N.*, 156 Misc 2d at 67).

3. The Plaintiffs' Second Cause of Action

Gender based classifications in statutes warrant "heightened scrutiny" (*United States v Virginia*, 518 US 515, 555 [1996]) requiring that the classification must serve "important governmental objectives" and "the discriminatory means employed [must be] substantially related to the achievement of those objectives" (*id.* at 533 [internal quotation marks omitted]). In addition, where a classification burdens the exercise of a fundamental right, the classification must be strictly scrutinized (*see Skinner v Oklahoma ex rel. Williamson*, 316 US 535 [1942]; *Frontiero v Richardson*, 411 US 677, 685-686 [1973]). Indeed, in *Stanley v Illinois*, the United States Supreme Court stated:

> "The rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and rights far more precious . . . than property rights . . . The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment" (*Stanley v Illinois*, 405 US 645, 651 [1972] [internal quotation marks and citations omitted]).

The issue here is not, as the DOH contends, whether there is a distinction between males and females in the birth process, as there most assuredly is one. Rather, the issue as framed in the amended complaint is whether there is an impermissible gender-based classification between parents *after* the birth of the child. Consequently, the plaintiffs' second cause of action stated a valid cause of action alleging that certain provisions of the Domestic Relations Law and the Family Court Act were unconstitutional and, thus, the Supreme Court erred in dismissing that cause of action pursuant to CPLR 3211 (a) (7).

Accordingly, the order is reversed insofar as appealed from, on the law, and that branch of the defendant's motion which was to dismiss the amended complaint pursuant to CPLR 3211 (a) (7) is denied.

DILLON, J.P., LEVENTHAL and CHAMBERS, JJ., concur.

Ordered that the order is reversed insofar as appealed from, on the law, with costs, and that branch of the defendant's motion which was to dismiss the amended complaint pursuant to CPLR 3211 (a) (7) is denied.