OPINION OF THE COURT
Barbara Salinitro, J.
On January 27, 2014, under Queens County Family Court *298 docket number A-19-20/14, pursuant to Domestic Relations Law § 115, Clifford Greenberg, Esq., on behalf of J.H.-W (hereinafter proposed adoptive parent), filed a petition seeking to adopt the proposed adoptive children, J.J. and H.C., both born on May 12, 2013 (hereinafter collectively proposed adoptive children). The proposed adoptive children are twins who are the biological children of the proposed adoptive parent’s spouse, M.H.-W. (hereinafter birth parent).[1] They were conceived with the birth parent’s sperm and an anonymous donor’s egg through in vitro fertilization and were born through gestational surrogacy in Mumbai, India. On May 12, 2013, in accordance with a surrogacy agreement, Y.M.A.K. (hereinafter gestational surrogate) immediately placed the proposed adoptive children post-birth with the birth parent.[2] On May 28, 2013, the proposed adoptive children were granted United States citizenship and were permitted to return to the United States with the birth parent and the proposed adoptive parent. The proposed adoptive children have been living with the birth parent and proposed adoptive parent since placement. The home study provided to the court reports that the proposed adoptive children are thriving in their care. The proposed adoptive parent seeks the court’s approval for finalization of his adoption petition.
New York’s attempt at keeping tempo with the unique issues flowing from perpetual medical advances in the field of reproductive technology as well as New York’s recently expanded view upon legal relationships is admirable, but not absolute. On June 24, 2011, Governor Cuomo signed the Marriage Equality Act into law which permits same-sex couples to legally marry in New York, codified as Domestic Relations Law § 10-a. Thus, the validity of the parties’ marriage in New York is not at issue. Domestic Relations Law § 110 permits a second parent adoption, where one spouse may adopt the child of the other spouse.[3] (See e.g. Matter of Jacob, 86 NY2d 651, 656 [1995] [holding that “the unmarried partner of a child’s biological (parent), whether *299 heterosexual or homosexual, who is raising the child together with the biological parent, can become the child’s second parent by means of adoption”].) Thus, the proposed adoptive parent’s ability to adopt the proposed adoptive children as a second parent is not at issue. The sole issue before the court is seemingly one of first impression. The proposed adoption calls upon the court to decide if a court may approve an adoption for finalization where New York statutorily deems the underlying surrogacy contract against public policy, and void and unenforceable.[4] (See Domestic Relations Law § 122.) The court now holds that it can.
Consequent to the decision in Matter of Baby M (109 NJ 396, 537 A2d 1227 [1988]), surrogacy was outlawed in New York. (See Domestic Relations Law §§ 121-124.) In Baby M, a surrogate who had entered into an agreement with a husband and wife who could not conceive, and who contributed her own genetic material, changed her mind after the baby’s birth and sought parental rights. (109 NJ 396, 537 A2d 1227.) The Baby M court invalidated the surrogacy contract as against public policy, granted custody to the birth father, voided the termination of the surrogate’s parental rights, voided the baby’s adoption by the birth father’s wife, and awarded visitation rights to the surrogate. (See id.) To date, New York has not amended its position on surrogacy. Accordingly, in New York, it is well-settled that a party to a surrogacy contract may not seek a court’s assistance to enforce the agreement, nor will such contract be deemed viable for any other claims arising under its arrangement. (See Itskov v New York Fertility Inst., Inc., 11 Misc 3d 68 [2d Dept 2006].)
There is no clear statutory answer, in the affirmative or the negative, to the question before the court. Hence, the court sought the guidance of case law, but found there to be a paucity of surrogacy case law in New York. Despite the fact that New York courts have decided some issues stemming from surrogacy contracts, there was no case on point. (See e.g. T.V. v New York *300 State Dept. of Health, 88 AD3d 290 [2d Dept 2011] [reversing, and holding that genetic mother and father stated viable causes of action, inter alia, for declaration that they be named legal parents to child born through gestational surrogacy by friend who received no compensation]; Doe v New York City Bd. of Health, 5 Misc 3d 424 [Sup Ct, NY County 2004] [after surrogacy arrangement, granting genetic mother and father birth certificates for their triplets, naming them as parents, instead of gestational mother]; Matter of Paul, 146 Misc 2d 379 [Fam Ct, Kings County 1990] [conditioning court’s acceptance of surrogate’s surrender upon her sworn testimony that she had not, and would not, request, accept, or receive monetary compensation in exchange for doing so, and proposed adoptive parents’ sworn affidavits regarding their intent not to provide financial reward to surrogate in exchange for child].) Although the cases address maternity and paternity, none of the cases directly focus on surrogacy contracts in the adoption context.
The surrogacy issue in the adoption arena arises in cases of heterosexual, lesbian and transgender couples who find that they are unable to become pregnant as well as homosexual male couples who, without a woman to carry their child, are unable to conceive. Those that choose to enter into a surrogacy arrangement become parties to what New York considers an “illegal contract.” (Social Services Law § 389 [setting forth criminal penalties for violations of Social Services Law § 374 (6)]; Social Services Law § 374 [6] [proscribing “baby selling”]; Itskov, 11 Misc 3d at 69-70.) Bearing that in mind, it is troublesome that when using a surrogate, birth parents who provide genetic material are legal parents to the child, yet their partners may not be able to achieve legal parentage through adoption, even though both planned on raising that child together in a family setting. Worse yet, in cases where neither partner has furnished their genetic material for a baby carried by a surrogate, neither parent could be deemed the legal parent of a child through adoption. Although such scenarios are consistent with statutes dictating that no person may give or accept any type of compensation in exchange for placement of a child for the purpose of adoption (see Social Services Law § 374 [6];[5] Domes *301 tic Relations Law § 115 [8][6], such results are inconsistent with the legislature’s intent that “each adoption should be judged upon the best interest of the child based upon the totality of the circumstances.” (L 1999, ch 522, § 1.) In fact, in proceedings involving children, the best interests of the child standard is a prevalent theme. (See e.g. Matter of D.S.S. v Timothy C., 114 AD3d 860, 861 [2d Dept 2014] [best interests of the child applied in paternity and child support proceedings]; Matter of Retamozzo v Moyer, 91 AD3d 957, 957 [2d Dept 2012] [best interests of the child standard applied in relocation cases]; Ekstra v Ekstra, 78 AD3d 990, 990 [2d Dept 2010] [best interests of the child standard applied in custody proceedings]; Matter of Carlena B., 61 AD3d 752, 752 [2d Dept 2009] [best interests of the child standard applied in Family Ct Act article 10 abuse and neglect proceedings]; Matter of Aliyanna M., 58 AD3d 853, 854 [2d Dept 2009] [best interests of the child standard applied in termination of parental rights *302 proceedings]; Valenza v Valenza, 143 AD2d 860, 862 [2d Dept 1988] [best interests of the child standard applied in visitation disputes].) Thus, there is a strong argument that despite the underpinning surrogacy arrangement, the best interests of the child under the totality of the circumstances should prevail.
In considering whether the court may approve an adoption finalization which is based upon an illegal surrogacy contract, the court found instructive Matter of Jacob (86 NY2d 651 [1995]), T.V. v New York State Dept. of Health (88 AD3d 290 [2d Dept 2011]) and Matter of Doe (7 Misc 3d 352 [Sur Ct, NY County, Jan. 25, 2005]). In Matter of Jacob (86 NY2d at 656), the Court of Appeals held that where a heterosexual or homosexual partner of a child’s biological parent was raising that child in a home together with the child’s biological parent, such partner could become the child’s legal second parent through adoption. Specifically, the court found the Jacob court’s rationale compelling, that to rule otherwise would cause an injustice to children in those circumstances who would be denied the benefit of having two legal parents who want to accept those rights and responsibilities and be granted that status. Moreover, in T.V. v New York State Dept. of Health (88 AD3d at 292-293), prior to the subject child’s birth, the gestational parents and the genetic parents, who had entered into a surrogacy contract, commenced a joint action seeking to have the genetic parents be declared legal parents without a formal adoption proceeding and precluding the identification of the gestational parents on the subject child’s birth certificate. The Supreme Court granted an order of filiation as to the genetic father only, directing that he be named as the father on the subject child’s birth certificate. (See T.V., 88 AD3d at 294.) The gestational parents and the genetic parents thereafter filed an amended complaint, seeking to have certain portions of the Domestic Relations Law and the Family Court Act adjudged unconstitutional in that they violated the genetic mother’s equal protection rights since they prevented her from establishing her legal relationship to the subject child. (See id.) The Nassau County Supreme Court dismissed their amended complaint for failure to state a cause of action, and the gestational parents and the genetic parents appealed. (See id. at 294-296.) The Second Department was called upon to decide whether their complaint stated cognizable causes of action, and held that it did. (See T.V., 88 AD3d at 292.) In the process of making its determination, and reversing the *303 Supreme Court’s dismissal, the T.V. court found that since there was no dispute about the subject child’s custody and care, and since the Supreme Court was not being asked to enforce the underlying surrogacy contract, the validity of the surrogacy contract was immaterial to the case. (See id. at 308-309.) The court finds the reasoning in T. V. to also be persuasive. Lastly, in Matter of Doe (7 Misc 3d 352 [Sur Ct, NY County, Jan. 25, 2005]), the issue before the court was whether certain language of a New York trust excluded fraternal twin grandchildren born of a California surrogacy arrangement from benefitting. The settlor’s trust dictated that adoptive children should not be recognized, but did not mention children who were the product of reproductive technologies. (Id.) The Doe court noted that reproductive technologies were not in existence at the time that the settlor created the trust in 1959. (Id.) Thus, the Doe court had to determine the settlor’s intent and determined that he contemplated non-blood relatives being beneficiaries to the trust. (Id.) The Doe court then analyzed California law to determine if the fraternal twin grandchildren were considered to be adopted. (Id.) The settlor’s daughter and her husband had obtained a judgment of parental relationship from the Superior Court of California which established their legal parentage of the twins. (Id.) The Doe court found that under California law, a judgment of parental relationship and an adoption are two markedly different proceedings, governed by separate divisions of the California Family Code, and gave full faith and credit to the judgment. (Id.) The Doe court then noted that although New York bars surrogacy contract enforcement, it sets forth a “statutory scheme explicitly contemplat[ing] full and fair proceedings to determine ‘parental rights, status or obligations’ ” such that children born of such arrangement would not be penalized. (Id. at 356, citing Domestic Relations Law § 124.) The court acknowledges that despite Domestic Relations Law § 124’s failure to expressly speak to reconciling its view on adoptions in conjunction with its view on surrogacy, Domestic Relations Law § 124 establishes a procedure to address any disagreements regarding parental rights of a child born through surrogacy and contemplates that such a dispute may revolve around a surrogate’s “valid surrender or consent to the adoption.” (Domestic Relations Law §§ 124 [2]; 122.)
Of significance are bills which have been introduced to the New York State Legislature recently. (See e.g. 2013 NY Senate *304 Bill S2547; 2013 NY Senate Bill S4617; 2013 NY Assembly Bill A6701.) Senate Bill S2547 seeks to repeal Domestic Relations Law article 8, eliminating the prohibition on surrogate parenting contracts.[7] The bill’s memorandum in support describes its purpose as a proposed law “[t]o ensure that loving and committed couples have every opportunity to raise and nurture . . . children — including the utilization of . . . gestational surrogate parenting contracts — a practice currently prohibited under New York State Law.” (Senate Introducer’s Mem in Support, 2013 NY Senate Bill S2547.) Senate Bill S4617 seeks to create the Child-Parent Security Act to establish legal relationships between parents and children born of artificial insemination and surrogate parenting contracts. (See 2013 NY Senate Bill S4617.) The proposed act would amend the Family Court Act, and repeal Domestic Relations Law article 8 and section 73. (See id.) Senate Bill S4617’s memorandum in support relates the obstacles confronting couples facing infertility as well as same-sex couples, and states that the proposed law “will provide clear and decisive legal procedures to ensure that each child’s relationship to his or her parent(s) is legally recognized[.] The new legal procedures will take into consideration the best interests of the child and the need for clarity and stability in family relationships.” Assembly Bill A6701 essentially mirrors Senate Bill S4617. (See 2013 NY Assembly Bill A6701.) Although a change may be on the horizon, until any such legislation has passed, the issue remains open.
In light of the foregoing, the court finds where a surrogacy contract exists and an adoption has been filed to establish legal parentage, such surrogacy contract does not foreclose an adoption from proceeding. Specifically here, there is no conflict over J.J.’s and H.C.’s care and custody. The proposed adoptive children were born in Mumbai, India to a gestational surrogate, who had contributed none of her own DNA to the creation of the proposed adoptive children, and whose intent from the outset was to relinquish her parental rights. The court is not being asked to enforce the surrogacy contract that forms the basis for the adoption, nor does the relief sought include claims relating to the surrogacy agreement itself. Rather, the proposed *305 adoptive parent, although not a biological parent, wants desperately to have equivalent legal status as the birth parent, which is what the couple had always envisioned as they proceeded on their bumpy road towards starting a family together, and is prepared to assume the rights and responsibilities that accompany legal parentage. In keeping with the legislature’s intent to encourage loving, happy families for children with parents who wish to accept that role,[8] the best interests of the proposed adoptive children under the totality of the circumstances, and reading Domestic Relations Law § 124 broadly, the court finds that the surrogacy contract’s legality is of no consequence to the matter. Accordingly, if all other requirements are met, the court shall approve the instant adoption. This decision should in no way be read to condone any violation of any New York State law.
Adjudged, that a court may approve an adoption for finalization, so long as all other requirements towards adoption have been met, where the underlying surrogacy contract is statutorily deemed against public policy, and void and unenforceable in New York; and it is therefore, ordered, that should all requirements be met in the instant case, the adoption of J.J. and H.C. may proceed to finalization.

. On November 11, 2011, the proposed adoptive parent and the birth parent were legally married in New York.

. Consistent with their surrogacy contract, the gestational surrogate executed an affidavit stating that she was waiving her parental rights to the proposed adoptive children since none of her genetic material was used towards their birth and since she had planned, since the outset, only to be a surrogate for, and not a parent to, the proposed adoptive children.

. Given that the law dictates a proposed adoptive parent’s pre-certification prior to acceptance of physical custody of a child, this law essentially waives the pre-certification requirement in regards to second parent adoptions. {See Domestic Relations Law § 115 [1] [b].)

. Surrogacy laws vary from state to state, ranging from complete prohibition with criminal penalties to total permission with a regulatory structure in place. (See e.g. DC Code §§ 16-401-16-402 [banning surrogacy contracts and establishing punishment, including imprisonment]; Ariz Rev Stat Ann § 25-218 [prohibiting surrogacy contracts, deeming surrogate to be legal mother and, if married, a rebuttable presumption that husband is legal father]; Tex Fam Code Ann §§ 160.751-160.763 [permitting surrogacy agreements so long as validated in court, and setting forth parameters].)

. “An authorized agency, as defined in paragraphs (a) and (c) of subdivision ten of section three hundred seventy-one of this title, may charge or accept a fee or other compensation to or from a *301 person or persons with whom it has placed out a child, for the reasonable and necessary expenses of such placement; and no agency placement; and no agency, association, corporation, institution, society or organization, except such an authorized agency, and no person may or shall request, accept or receive any compensation or thing of value, directly or indirectly, in connection with the placing out or adoption of a child or for assisting a birth parent, relative or guardian of a child in arranging for the placement of the child for the purpose of adoption; and no person may or shall pay or give to any person or to any agency, association, corporation, institution, society or organization, except such an authorized agency, any compensation or thing of value in connection with the placing out or adoption of a child or for assisting a birth parent, relative or guardian of a child in arranging for the placement of the child for the purpose of adoption. The prohibition set forth in this section applies to any adoptive placement activity involving a child born in New York state or brought into this state or involving a New York resident seeking to bring a child into New York state for the purpose of adoption.” (Social Services Law § 374 [6].)

. “The adoptive parent or parents shall also present an affidavit describing all fees, compensation and other remunerations paid by such parent or parents on account of or incidental to the birth or care of the adoptive child, the pregnancy or care of the adoptive child’s mother or the placement or adoption of the child and on account of or incidental to assistance in arrangements for such placement or adoption. The attorney representing the adoptive parents shall also present an affidavit describing all fees, compensation and other remuneration received by him on account of or incidental to the placement or adoption of the child or assistance in arrangements for such placement or adoption.” (Domestic Relations Law § 115 [8].)

. The bill’s memorandum in support criticizes New York’s ban on surrogate parenting contracts as outdated, not anticipating reproductive technology’s always evolving landscape, and “den[ying] intended parents what may be their only means of procreating.” (Senate Introducer’s Mem in Support, 2013 NY Senate Bill S2547.)

. “[T]he spirit behind the modern-day [statutory] amendments . . . encourages] the adoption of as many children as possible.” (See e.g. Matter of Jacob, 86 NY2d 651, 662 [1995].)